# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> v. <br><br> **[1] AHSHA NATEEF TRIBBLE** <br> **[2] DONALD KEITH ELLISON,** <br><br> Defendant. | CRIMINAL NO: 19-541(FAB) |

## **RESPONSE IN OPPOSITION TO MOTION TO TRANSFER VENUE**

**TO THE HONORABLE COURT:**

   **COMES NOW** the United States of America by and through the undersigned attorney and before this Honorable Court very respectfully states and prays as follows:

   On March 16, 2020, Defendant [2] Donald Keith Ellison ("Ellison") filed a Motion to Transfer Venue requesting that Ellison be tried in the Southern District of Texas rather than in the District of Puerto Rico. Docket No. 94. Defendant [1] Ahsha Nateef Tribble ("Tribble") joined the motion on March 26, 2020. Docket No. 98. This transfer request is made before the court has questioned a single prospective juror for the January 19, 2021 trial. Defendants rely on a phone/internet poll of 251 people in Puerto Rico to argue that a fair and impartial jury trial is "impossible." This "study" is no substitute for a full voir dire process.

   In fact, there is no legal or factual basis to conclude that this Court is incapable of empaneling a fair and impartial jury. Similarly, there is no legal or factual basis to conclude that a jury selected from a pool of approximately three million U.S. citizens residing in Puerto Rico will be unable to follow the Court's instructions, and fairly and impartially evaluate the evidence at trial. As explained more fully below, the United States respectfully opposes the motion to transfer venue and submits that this Honorable Court should deny the defendants' request for transfer of

venue.

## I. STANDARD OF REVIEW

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amdt. 6. It also secures to criminal defendants the right to trial by "an impartial jury," Amdt. 6, and to due process of law, Amdt. 5. Taken together, these provisions require a change of venue at a defendant's request if, but only if, "extraordinary local prejudice will prevent a fair trial." *United States v. Skilling*, 561 U.S. 358, 378 (2010) (emphasis added).

### A. Rule 21(a)

The mechanism for seeking a change of venue based on pretrial prejudice is Federal Rule of Criminal Procedure 21(a), which states:

> Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed.R.CrimP. 21(a).

A Rule 21(a) motion "is addressed to the sound discretion of the trial court." *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir. 1984). "A district court abuses its discretion [only] when it makes an error of law or if it bases its decision on a clearly erroneous assessment of the evidence." See *United States v. Wilcox*, 631 F.3d 740, 747 (5th Cir. 2011). "The burden of establishing prejudicial pretrial publicity is on him who asserts it." *Wansley v. Slayton*, 487 F.2d 90, 94 (4th Cir. 1973); see also *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994) ("[Defendant] must establish that an irrepressibly hostile attitude pervaded the community. This is a difficult standard, even in

cases in which there has been extensive media coverage . . . .") (internal quotation marks and citation omitted); *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985) ("The presumptive prejudice standard . . . is only rarely applicable, and is reserved for an extreme situation. In short, the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.").

The standard for presuming prejudice on the basis of negative community sentiment and pretrial publicity was developed by the Supreme Court in three cases, all of which were decided over 50 years ago: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The facts of those cases are instructive. *Rideau* involved a defendant who was tried in a Louisiana parish of 150,000 people and convicted of robbery, kidnapping, and murder. *Rideau*, 373 U.S. at 724. Police interrogated the defendant in jail following his arrest and filmed his confession. *Id*. On three separate occasions shortly before trial, which took place less than two months after the arrest, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. *Id*. In reversing the defendant's conviction, the Supreme Court observed:

> What the people saw on their television sets was [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder. . . . this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial -- at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

*Id*. at 726.

The trial in *Estes* was "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." See *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (summarizing *Rideau*, *Estes*, and

*Sheppard*). And in *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially [the defendant]." *Sheppard*, 384 U.S. at 355 see also *McVeigh*, 153 F.3d at 1182, 1166 (10th Cir. 1998) ("despite the proliferation of the news media and its technology, the Supreme Court has not found a single case of presumed prejudice in this country since the watershed case of *Sheppard*.").

*Rideau*, *Estes*, and *Sheppard* each involved a "conviction obtained in a trial atmosphere that was utterly corrupted by press coverage." See *Skilling*, 561 U.S. at 380-81. That is, in each of these cases, pretrial publicity "so permeated the community" that it "displaced the judicial process." *McVeigh*, 153 F.3d at 1181.

Media coverage portraying a defendant in a negative light, however, is not sufficient alone to compel the Court to presume that prejudice has contaminated the pool of potential jurors to such a degree that a trial in Puerto Rico would be nothing but a circus-like, hollow formality. See *Skilling*, 56 U.S. at 380-81 ("[O]ur decisions . . . cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process. Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated does not require ignorance.") (internal quotation marks and citations omitted); see also *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976) (holding that "pretrial publicity -- even pervasive, adverse publicity -- does not inevitably lead to an unfair trial."); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 404 n.1 (1970) (Rehnquist, J., concurring) ("In fact, as both the Court and the dissent recognize, the instances in which pretrial publicity alone, even pervasive and adverse publicity, actually deprives a defendant of the ability to obtain a fair trial will be quite rare.") (collecting cases).

As a matter of law, the Court should examine whether a presumption of prejudice

warranting a change of venue has arisen as a result of pretrial publicity based on the following factors: "the size and characteristics of the community, the nature of the publicity, the time between the media attention and the trial, and whether the jury's decision indicated bias." *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 59 (D. Mass. 2016) (citing *Skilling*, 561 U.S. at 382-84).

## II. DISCUSSION

An evaluation of the pertinent Rule 21(a) factors[1] compels the Court to deny defendants' request to transfer of venue at this time, and allow voir dire to proceed in the District of Puerto Rico. See *United States v. Guillon*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); see also *Patton v. Yount*, 467 U.S. 1025, 1038 n.13 (1984) ("[V]oir dire has long been recognized as an effective method of rooting out . . . [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner.") (internal quotation marks and citation omitted); *Correia v. Fitzgerald*, 354 F.3d 47, 52 (1st Cir. 2003) ("The best way to ensure that jurors do not harbor biases for or against the parties is for the trial court to conduct a thorough voir dire examination. Assuming that venirepersons pass through this screen, the trial court thereafter may operate on the presumption that the chosen jurors will obey the judge's instructions to put extraneous matters aside and decide each case on its merits.") (citations omitted).

**A. The Size and Characteristics of the Community in Which the Crime Occurred**

Puerto Rico has a population of over three million people from which a fair and impartial jury may be empaneled. See *United States v. Casellas-Toro*, 807 F.3d 380, 386 (1st Cir. 2015). There is simply no basis to conclude that the Court will be unable to empanel 12 fair and impartial jurors

---

[1] Obviously, there is no jury decision to evaluate at this time.

from a population of over three million people.² See *In Re Tsarnaev*, 780 F.3d 14, 24 (1st Cir. 2015) (rejecting the argument that pretrial publicity of Boston marathon bombing automatically disqualified population of three million people as potential jurors).

In *In re Tsarnaev*, the defendant argued that the Boston marathon bombings so impacted the entire Boston-area community that prejudice should be presumed for the entire Eastern Division of Massachusetts. *Id.* at 21. The First Circuit rejected that argument, even though Tsarnaev was actually charged with causing the Boston marathon bombing. The First Circuit noted that Boston was comprised of a diverse metropolitan area and that the voir dire responses and defendant's own statistics revealed "hundreds of members of the venire have not formed an opinion that he is guilty," *Id*.

The United States respectfully submits that the best, and preferred method, to determine whether venire members have formed an opinion as to guilt is to actually poll potential jurors via the voir dire process. After all, the mechanism that our legal system provides for the Court to achieve the task of jury selection is voir dire, not public opinion surveys. See, e.g., *Correia v. Fitzgerald*, 354 F.3d 47, 52 (1st Cir. 2003); see also *Shapiro v. Kauffman*, 855 F.2d 620, 621 (8th Cir. 1988) ("Public opinion polls introduced with the purpose of demonstrating jury bias have found little favor with the courts.") (citing cases); *United States v. Rodriguez*, 581 F.3d 775, 786 (8th Cir. 2009) ("This court's precedents do not require a district court to consider public opinion polls when ruling on change-of-venue motions."); *United States v. Mandel*, 431 F. Supp. 90, 101

---

² All adult U.S. citizens residing in Puerto Rico are eligible for consideration as potential jurors. See, e.g., *United States v. Ramos-Colon*, 415 F. Supp. 459, 462-63 (D.P.R. 1976) ("In looking at the declaration of policy contained in 28 U.S.C. § 1861 we find that it requires that grand and petit juries be selected at random from a fair cross section of the community and that all citizens . . . have the opportunity to be considered for service. This does not mean that precise proportional representation of any particular group is required on the grand or petit panel, but rather that the group from which they are selected be taken by chance (i.e., at random), from the community.") (internal quotation marks and citations omitted).

(D. Md. 1977) ("In the opinion of the Court, a public opinion poll is no substitute for voir dire examination.").

The Supreme Court has consistently recognized voir dire to be effective at rooting out prejudices. See *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) ("It is fair to assume that the method [of voir dire] we have relied on since the beginning, e.g., *United States v. Burr*, 25 F. Cas. 49, 51 (No. 14,692g) (CC Va. 1807) (Marshall, C.J.), usually identifies bias."); accord *Doan v. Haviland*, No. 1:00cv727, 2004 U.S. Dist. LEXIS 33470, at *173 (S.D. Ohio Dec. 20, 200) ("Voir dire is the best method for determining whether, despite pretrial publicity, a fair and impartial jury can be obtained in the local community.").

The Court does not have the benefit of any voir dire responses because this case is not scheduled for trial until January 19, 2021. Nonetheless, Ellison's own December 2019 telephone/internet poll of 251 people in Puerto Rico purports to conclude that a majority of respondents (55.38% or 139/251) had not formed an opinion regarding the defendants' guilt. Docket No. 94, p. 41, ¶ 33 (38.6% were unfamiliar with the case; 16.7% felt defendants are not guilty or don't know). A majority of respondents (54.18% or 136/251) also had not sensed more than a little anger in the community. *Id*. at p. 48, ¶ 34 (38.6% unfamiliar with the case; 15.53% sensed little or no anger or did not know). If the Court were to rely on the poll, which it need not, the poll reflects that a majority of venire members have not formed an opinion as to guilt, have not sensed significant community anger, and the court would likely have no difficulty in selecting 12 impartial jurors.

Through voir dire, the Court could also question and determine if potential jurors felt that they had been directly impacted by Tribble, Ellison or even Cobra Acquisitions LLC. This line of questioning would be much more relevant than Ellison's poll regarding individuals affected by

Hurricane Maria. The defendants in this case are not charged with causing Hurricane Maria. It is conceivable, if not likely, that a large number of potential jurors would have no knowledge of who Mr. Ellison is, who Ms. Tribble is, or what specific restoration efforts Cobra Acquisitions LLC (Cobra) was involved in. After all, Cobra was not the only entity providing power restoration services in Puerto Rico after Hurricane Maria.

Followed to their logical end, the defendants' arguments would require the court to transfer venue of any and all criminal case brought in relation Hurricane Maria simply because residents of Puerto Rico were impacted by Hurricane Maria. On a larger scale, the defendants' arguments would require a conclusion that fraud related to the COVID-19 pandemic could not be fairly tried in any district. Such a conclusion is not supported by the current state of the law nor the reality that an impartial jury can be selected in Puerto Rico for the pending charges against defendants.

Given the large size of the community and the likely ability to identify individuals who have not formed an opinion regarding defendants' guilt, this factor does not support mandatory transfer of venue.

### B. The Nature of the Publicity Surrounding the Case

The nature of the publicity surrounding this case has not been extraordinary or pervasive. News outlets in Puerto Rico and the mainland United States reported on the content of the indictment at the time of the defendants' arrests and appearance in court in Puerto Rico in late September and early October 2019.[3] This fact is not surprising given nature of the instant case.

The United States issued a press release regarding the return of the indictment and held a press conference communicating the charged conduct to the public. In both, the United States explicitly stated that the defendants are presumed innocent until proven guilty. Subsequently, some news

---

[3] This fact may explain in part why Ellison's poll reflected that 27.8% of Texas respondents were familiar with the case. Docket No. 94, p. 38, ¶ 31(c).

outlets have published public information regarding the criminal case, including the status of the production of discovery, defendant [3] Jovanda Patterson's guilty plea, and the trial date.

To the United States' knowledge, no documentary evidence or witness statements outside of the descriptions contained in the indictment have been published by the press. This court issued a protective order regarding the discovery in this case; however, the court has not been asked nor *sua sponte* considered a gag order due to any extraordinary pre-trial publicity.

Ellison claims that 140 news articles were published by multiple news outlets in Puerto Rico over the last six months. The United States submits that most news articles have occurred when a significant development has occurred, i.e. the arrests, a court appearance, a status conference, or a guilty plea. As a result, multiple articles may have been published by multiple media outlets in relation to the same singular procedural event.

Unlike *Cassellas-Toro*, there is no pervasive daily news coverage regarding this case or the defendants' criminal conduct. See *Casellas-Toro*, 807 F.3d at 388 (noting that media "continuously, intensely, and uninterruptedly covered the Casellas case virtually on a daily basis" and where voir dire "occurred two months after [the defendant's] televised sentencing in the [state] murder case."). In fact, of the six articles cited by Ellison to support prejudicial news coverage, five were published by El Vocero and NotiCel in October 2019 and the sixth was purportedly published by CyberNews in March 2020.[4] None of the articles cited by Ellison appear to contain any unduly prejudicial information inasmuch as they reflect the serious charges facing Tribble and Ellison.

Defendants have both been charged in Count 1 with conspiracy to commit bribery in violation of 18 U.S.C. § 371. Docket No. 3, p. 11. As a part of that conspiracy, it is alleged that Ellison "did

---

[4] The United States has been unable to locate the March 5, 2020 CyberNews article online.

corruptly give, offer, and promise a thing of value to a public official, namely [1] Ahsha Nateef Tribble, with intent to influence an official act…" *Id*. at ¶ 37. Further, "[1] Ahsha Nateef Tribble, being a public official, directly and indirectly, would and did corruptly demand, seek, receive, accept, and agree to receive and accept a thing of value from [2] Donald Keith Ellison, in return for [1] Ahsha Nateef Tribble being influenced in the performance of any official act…" *Id*. at ¶ 37.

The purpose of the conspiracy included "to influence [1] Ahsha Nateef Tribble's performance of official acts as a FEMA employee… in connection to COBRA's contracts with PREPA related to electric power grid restoration after Hurricane Maria." *Id*. ¶ 39.

As a part of the conspiracy, it is further alleged that Tribble "performed official acts through her FEMA employment to advance COBRA's interest and secure favorable treatment for COBRA as needed and as specific opportunities arose in connection with the contracts signed between PREPA and COBRA, the payment of work billed under the contracts, and work assigned by PREPA to COBRA pursuant to the contracts." *Id*. at ¶ 43.

Defendants are both charged in Counts 2-5 with honest services wire fraud in violation of 18 U.S.C. § 1343, 1346. *Id* at p. 31. It is alleged that the defendants "devise[d] a scheme and artifice to defraud the United States and the citizens of Puerto Rico, through bribery, of the honest services of [1] Ahsha Nateef Tribble" and that a purpose of the scheme was for "[1] Ahsha Nateef Tribble to enrich herself" and for "[2] Donald Keith Ellison to enrich himself." *Id*. at ¶ 97, 98, 99.

Both Tribble and Ellison are also charged in Count 6 with major disaster fraud in violation of 18 U.S.C. § 1040. *Id* at. p. 36. The scheme is alleged to have involved "the FEMA reimbursement of monies pursuant to the Public Assistance Program for work paid or to be paid by PREPA under the First COBRA and Second COBRA Contracts for the restoration of the electric power grid, that was… paid in connection with… a major disaster declaration for Puerto Rico… due to damage

caused on September 20, 2017 and continuing thereafter, resulting from Hurricane Maria." *Id*. at ¶ 111.

The contracts and amendments at issue are described in the indictment. *Id*. at p. 7-11. Via the amendment signed by Ellison on or about February 27, 2018, it is alleged that the first Cobra contract had a value not to exceed $945,429,800. *Id*. at ¶ 31. The second Cobra contract executed on or about March 26, 2018, had a value not to exceed $900,000,000. *Id*. at ¶ 32(b).

As a result, press reports and the public statements from the United States Attorney's Office regarding the fact that the defendants are charged in a $1.8 billion bribe scheme wherein they enriched themselves through exerting official pressure due a personal relationship are directly based on the allegations specifically contained in indictment. Similarly, press reports of voluminous discovery are hardly prejudicial when Ellison has publically acknowledged "the Government's voluminous discovery" containing "over 550 gigabytes of documents." Docket No. 80, p. 4, 7.

After all, the Supreme Court has made clear that "prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance*." *Skilling*, 561 U.S. at 381; citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A potential juror need not be ignorant about a case to be fair and impartial. Nor must a potential juror have refrained from forming an opinion about a particular defendant's guilt to be eligible to serve. First observed in 1879, and as repeated many times since, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155–56 (1879); accord *Irvin v. Dowd*, 366 U.S. 717 (1961); *Skilling*, 561 U.S. at 381.

"[I]t is a premise of [our] system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." *Skilling*, 561 U.S. at 398 n.34; see also *Irvin*, 366 U.S. at 723 ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987) ("[Jurors] are presumed to be impartial . . . [and the] existence of a juror's preconceived notion as to the guilt of the accused will not by itself destroy the presumption of impartiality.").

Further, the residents of Puerto Rico have demonstrated a record of deciding high-profile public corruption cases fairly and impartially. Perhaps the best example is *United States v. Acevedo-Vila*, Criminal No. 08-036 (D.P.R. 2008), a public corruption case brought in 2008 against the then-sitting governor of Puerto Rico, Anibal Acevedo-Vila. Though the case garnered widespread media attention, Acevedo-Vila was acquitted following a 29-day trial in the District of Puerto Rico.

Again, it is the role of the court to determine during voir dire whether a juror is capable of serving fairly and impartially. Given that the nature of the publicity surrounding this case has not been extraordinary or pervasive and impartial jurors are likely to be readily identified via the voir dire process, this factor does not support mandatory transfer of venue.

### C. Time Between Media Attention and Trial

The third factor to evaluate in relation to a request for mandatory transfer of venue is the time between media attention and trial. Trial is scheduled for January 19, 2021. Docket No. 87. That date is more than 15 months after the return of the indictment, arrest of the defendants, and the

related media coverage. Unlike *Rideau* where the trial swiftly followed the crime, the passage of years from the commission of the crime and 15 months from the indictment is a substantial amount of time and more than sufficient to mitigate the potential of presumed juror prejudice. Given the extended passage of time between indictment-related press coverage and the January 19, 2021 trial date, this factor does not support mandatory transfer of venue.

### D. Rule 21(b) - The Interest of Justice Does Not Warrant a Change of Venue

It is no doubt true that moving trials to distant districts will nearly always reduce the number of potential jurors with knowledge of, or a personal connection to, the underlying events. But the Framers of our Constitution considered it more important to keep trials local. "The Colonists believed in the concept that the community which had suffered injury should be allowed to judge those charged with the injury. . . . To this day, the interest of a community in trying those who violate its laws remains a central tenet of our judicial system." *United States v. Dubon-Otero*, 76 F. Supp. 2d 161, 164 (D.P.R. 1999) (internal quotation marks and citations omitted).

It is, therefore, not surprising that courts have denied motions to transfer venue in extraordinarily high-profile cases with broad impact on the local population. See, e.g., *Skilling*, 561 U.S. at 358 (former CEO of Enron Corporation which crashed into bankruptcy as a result of fraud); *United States v. Salameh*, No. S5 93 CR 0180 (KTD), 1993 U.S. Dist. LEXIS 12770 (S.D.N.Y. Sept. 15, 1993) (first World Trade Center Bombing); *United States v. Tsarnaev*, 157 F. Supp. 3d 57 (D.Mass. 2016) (Boston Marathon bombing); *People v. Charles Manson*, 71 Cal. App. 3d 1 (Cal.App. 2d Dep't 1977) (leader of murderous cult); *New York v. David Berkowitz*, 93 Misc. 2d 873 (1978) ("Son of Sam" serial killer).

Several factors have been deemed useful for the court's evaluation of a discretionary transfer of venue under Rule 21(b) whereby "the court may transfer the proceedings, or one or more counts,

against [the] defendant to another district for the convenience of the parties, any victim, and the witnesses, **and** in the interest of justice." Fed.R.Crim.P. 21(b) (emphasis added). Those factors include "(1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer." *Platt v. Minnesota Min. & Mfg. Co.*, 376 U.S. 240, 243-244 (1961). None of these factors favor transfer of this case, let alone transfer to the Southern District of Texas.

Neither of the defendants in this case are residents of Texas, nor do they appear to have any connection to Texas. Tribble is currently residing in the Middle District of Florida and as a condition of pre-trial release is permitted to travel to Puerto Rico, Washington DC, New York, and Georgia. Docket No. 53. Ellison is currently residing in Georgia, after moving from Oklahoma, and as a condition of pre-trial release is permitted travel to Florida and Puerto Rico. Docket Nos. 16, 84.

Tribble was employed by FEMA at the pertinent times alleged in the indictment and was an official in Region II, which includes New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands. Docket No. 3, ¶ 19-20.

Ellison was employed by Cobra Acquisitions LLC ("Cobra"), which is located in Oklahoma and is registered in Delaware. *Id*. at ¶ 11. Cobra is a subsidiary of Mammoth Energy Services, Inc., which operates from Oklahoma City, Oklahoma as well. *Id*. at ¶ 12.

Ellison claims that Cobra is based in Oklahoma City, Oklahoma and Dallas, Texas. Docket No. 94, p. 20. No citation or other support is provided to establish a connection between Cobra

and Dallas, Texas. In fact, the United States is unaware of any operations of Cobra in Texas at the current time or relevant to the facts of the indictment. There would appear to be no convenience to the defendants to trial in Texas.

The most convenient venue for witnesses is Puerto Rico. This case involves multiple witnesses who were involved in the power restoration efforts in Puerto Rico following Hurricane Maria. A significant number of witnesses are FEMA and Puerto Rico Electric Power Authority (PREPA) employees who continue to reside in Puerto Rico. Given the nature of the disaster, people from different parts of the United States traveled to and worked in Puerto Rico as a part of the restoration efforts.[5] As a result, there are also some witnesses that currently reside elsewhere, but have knowledge of activity and the events at issue, which occurred in Puerto Rico. Those individuals are not located in any one area, making it more convenient to travel where the most witnesses are located rather than virtually everyone traveling to Texas.

Ellison claims that "[w]itnesses and documents needed to establish the defense will be located primarily in Texas." Docket No. 94, p. 23. This claim is completely unsupported and is inconsistent with the factual allegations of the indictment, the witnesses likely to testify, and the evidence already disclosed. None of the contract work was negotiated or performed in Texas. Tribble was not assigned to work in Texas. Cobra is not known to have conducted relevant business or retained documentation in Texas. Tribble and Ellison are not alleged to have traveled to Texas as a part of the conspiracy and fraud scheme.

Defense counsel are not located in Texas and there is simply no reason to believe that the expense to the parties will be less in Texas than Puerto Rico. San Juan is readily accessible to defendants and their counsel via direct flights. Lastly, the docket conditions of the court in Puerto

---

[5] It is also possible that multiple custodians of records will testify related to records and documents obtained in the investigation. These witnesses are from various locations, including Puerto Rico, and are not centered in Texas.

Rico are actually better than that of Texas. *Id*. at p. 94 (comparing 1,196 criminal cases in the District of Puerto Rico and 9,409 cases in the Southern District of Texas). With this in mind, it cannot be said that Texas is a more convenient venue, nor is a transfer of venue warranted in the interest of justice.

### B. CONCLUSION

The facts of this case do not warrant a finding of presumed prejudice any more than the facts of the above-cited high-profile cases so warranted. At a minimum, the Court should decline defendants' invitation to conclude that empaneling a fair and impartial jury in the District of Puerto Rico is impossible unless and until the voir dire process demonstrates otherwise.

**WHEREFORE**, the United States respectfully submits that Defendant [2] Donald Keith Ellison's Motion to Transfer Venue (Docket No. 94) be **DENIED**.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 3rd day of April, 2020.

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants.

W. STEPHEN MULDROW
United States Attorney

*s/Seth A. Erbe*
**SETH A. ERBE**
Assistant United States Attorney
USDC-PR No. 220807

United States Attorney's Office
Torre Chardón, Suite 1201
350 Carlos Chardón Ave.
San Juan, PR 00918
seth.a.erbe@usdoj.gov
Tel. (787) 766-5656